1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JASMINE TAGGART,                         No. CIV S-06-0563-CMK

12             Plaintiff,

13      vs.                                   <u>MEMORANDUM OPINION AND ORDER</u>

14  MICHAEL J. ASTRUE,[1]
    Commissioner of Social Security,
15
               Defendant.
16
    _____/
17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21  plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-motion for summary

22  judgment (Doc. 16).

23  / / /

24  _____

25      [1]      Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is
    substituted for his predecessor.  The Clerk of the Court is directed to update the docket to reflect
26  the above caption.

1

# I. BACKGROUND

Plaintiff, a minor at the time, applied for child's supplemental security income benefits based on disability.[2]  In her application, plaintiff claims that her impairment began on January 1, 1995.  Plaintiff claims her disability consists of a combination of conduct disorder, depressive disorder, and opposition defiant disorder.   Plaintiff is a United States citizen born November 22, 1988.

### A.   <u>Summary of the Evidence</u>

Plaintiff does not dispute the ALJ's summary of the evidence.  As to non-medical evidence, consisting of plaintiff's school and court records, the ALJ stated:

> Cordova High School Discipline Report records indicate that in 2003 the claimant had nine class suspensions, two suspensions off site, and three Saturday school assignments.  These were due to class behavior, truant period, defiance, mutual combat, profanity, and dress code violation.
>
> * * *
>
> Records at Exhibit 10E contain petitions for a supplemental petition (ward) on the claimant in July 2003 and for misdemeanor violations in August 2003.
>
> Grant School Records for 2002-2003 document the claimant was tardy 38 periods and had 30 unverified periods; Cordova High School period attendance report for August 26, 2002, through June 12, 2003, indicated she had 27 unexcused periods, 40 excused periods, and 22 tardy periods and for August 25, 2003, through September 17, 2003, she had 7 unexcused periods, 25 excused, and one tardy period; Folsom Cordova USD academic records for the tenth grade indicated her grades ranged from one F to one A; Cordova High School principle [sic] Jackie Levy in September 2003 recommended expulsion of the claimant as it was determined she was potentially dangerous to the staff and students; and October 7, 2003, she was referred to Mather Youth Academy.
>
> Sacramento City USD records document her grades from January 2003 to January 2005 ranged from 11 A's to five F's and her total GPA was 2.33.

/ / /

---

[2]      For a child, disability is established if medically determinable impairments result in functional limitations with respect to six specified "domains" of functionality.  Benefits are paid out of the parent's social security account.

1          Mather Youth Academy discipline report indicated she had nine
       suspensions off site, two suspensions on site, 10 class suspensions, five
2          referrals, had three Saturday school assignments, and one conference.
       These were for profanity, disruptive behavior, defiance, assault, battery,
3          mutual combat, dress code violation, truant period, and class behavior.

4          Hiram W. Johnson High School discipline report records document she
       had two detentions, two principal suspensions, a warning, and a Saturday
5          schedule and third quarter grades for January 31, 2005, through April 15,
       2005, document one A, one C, and four F's.
6

7   The ALJ also summarized the medical records:

8          The evidence of record documents the claimant has been treated at Kaiser
       Permanent[e] January 29, 2003, for acne, February 14, 2003, for cellulitis
9          secondary to an insect bite, and April 23, 2003, for acne and behavioral
       problems and according to her mother anger problems with examination
10         finding her alert but unwilling to talk.  March 6, 2003, she was referred to
       anger management class due [to] recently physically assaulting a woman
11         at school who was fighting with her mother but no suicidal or homicidal
       ideation was reported.  March 12, 2003, for acne check, May 25, 2003, her
12         mother contacted Kaiser to reestablish counseling/anger management, and
       May 28, 2003, a child/adolescent-treatment plan indicated the objective
13         was to improve her behavior at home/school by October 2003.  A mental
       status examination May 28, 2003, was normal, except for a depressed
14         mood, poor judgment, and rule out mood, anxiety, and behavior disorders.
       June 16, 2003, she failed to keep her appointment at the pediatrics clinic.
15         Her July 14, 2003, appointment was cancelled, and she was a no show for
       her August 6, 2003, appointment.  August 12, 2003, she was seen for acne.
16

17  The ALJ then described a series of rescheduled and missed medical appointments, and added:

18         She was seen September 17, 2004, and the chart note indicated she had
       been kicked out of regular school and was attending Mather Academy,
19         and she was very resistive with no eye contact and almost mute.
       September 20, 2004, she failed to keep her appointment but was seen
20         September 22, 2004, for an insect bite.  October 15, 2004, she was notably
       more friendly, upbeat, had a three day suspension at school due to lack of
21         cooperation, mother reported she was very up and down with mood, very
       negative and very self-deprecating, and diagnosis was depression NOS.
22         October 19, 2004, she was seen for problems with sleeping and denied
       suicidal ideation.  October 20, 2004, Dr. Karl Buddenhagen (Ph.D.) was
23         very impressed by her improvement since she had begun at Mather
       Academy, but her mother reported the same mood problems as the prior
24         week, and the doctor noted he could clearly observe clinically her sadness
       beneath a pretty fragile/tough demeanor.  November 19, 2004, the chart
25         note indicated the mother reported things were not working out at Mather,
       and the claimant would be enrolled in Hiram Johnson, but Dr.
26         Buddenhagen noted she was quiet but looking less stressed and seemed

less angry but also a bit more child like.  December 3, 2004, she was diagnosed with oppositional defiant disorder and depression NOS.  She was a no show December 17, 2004.  December 29, 2004, a mental health phone message form indicated the claimant was tolerating Seroquel well with no side effects.  January 12, 2005, she was a no show and February 11, 2005, she failed to keep her appointment.

Dr. Thomas Daniel performed a comprehensive psychiatric consultative evaluation (CE) on August 29, 2003, for a reported problem fighting at the movies and resisting arrest as well as depression, bodily complaints, difficulty concentrating, sleep problems, temper, violence, disorganized thinking, bizarre thoughts, family problems, problems at school, and loss of interest.  Neither the claimant nor her mother reported being on any psychiatric medications.  The mental status examination was normal, except for poor eye contact, sad mood with constricted affect, and some difficulty with performing serial 7's and 3's.  Diagnosis was conduct disorder, childhood onset with GAF rated at 60.  Dr. Daniel noted she was being raised in a chaotic family and was the product of a chaotic family, with multiple members with serious legal problems.  He opined that she could be expected to be oppositional to . . . performing simple instructions, responding appropriately to co-workers, supervisors and the public, respond[ing] appropriately to a usual work situation, and dealing with changes in a routine work setting.

* * *

Dr. Robert Diamond reported March 30, 2005, the claimant was seen for a psychiatric evaluation  December 3, 2004, and was diagnosed with depressive disorder NOS and oppositional defiant disorder; that she appeared quite emotionally labile, impulsive, moody, irritable, anxious, and explosive, and as resistant and oppositional, but still workable; he prescribed fluoxetine (Prozac), and . . . her mother reported the medication helped somewhat; and that she missed one follow-up appointment and had a follow-up scheduled for April 29, 2005, and one with Dr. Buddenhagen on April 15, 2005.

In addition to the foregoing, the record contains two child disability evaluations completed by agency physicians – a November 24, 2003,[3] initial evaluation performed by Rosemary Tyl, M.D., and a March 13, 2004, second evaluation performed by V. Meenakshi, M.D.  Both doctors opined that plaintiff has impairments which are severe, but which do not functionally equal any listed impairment.  As to the domains of functionality, Dr. Tyl found no limitations in plaintiff's ability to:  (1) acquire and use information; (2) attend and complete

---

[3]     Both the index to the certified administrative record and the ALJ's hearing decision incorrectly list the date of this evaluation as January 24, 2003.

4

1   tasks; (3) move about and manipulate objects; and (4) care for herself.  Dr. Tyl also found no

2   limitation in plaintiff's health and physical well-being.  Dr. Tyl did, however, indicate a

3   "marked" limitation in plaintiff's ability to interact and relate with others.  Specifically, Dr. Tyl

4   noted:

> The rating in this area is questionable from less than marked to no
> limitations.  Child does have a history of truancy from school and defiance
> in the classroom.  Per the mother, the child is aggressive and has problems
> with others who do not comply with her wishes.  The child has been able
> to relate to medical professionals without problems.  Child has a history of
> criminal behavior and comes from a family where criminal behavior is a
> fact of life.  Data in file indicates that her behavior is . . . learned due to
> family dynamics, not the result of a mental illness.

10   In the March 2004 evaluation, Dr. Meenakshi believed that plaintiff had a "less than marked"

11   limitation in attending and completing tasks and a "marked" limitation interacting and relating

12   with others.   Dr. Meenakshi found no limitations in any other domain of functioning.

13            Finally, as alluded to above, both plaintiff and her family have had problems with

14   the law.  Specifically, as to the family, the record reflects that plaintiff's mother was convicted of

15   welfare fraud.  The record also reflects that plaintiff has numerous family members, including

16   her father, who are in prison.  As to plaintiff, the record reflects the following criminal

17   violations:  (1) attempted and actual use of force and violence, in violation of California Penal

18   Code §§ 240 and 242; (2) resisting arrest, in violation of California Penal Code § 148(a)(1); and

19   (3) disturbing the peace by offensive language, in violation of California Penal Code § 415(3).

20       **B.    Procedural History**

21            Plaintiff's claim was initially denied.  Following denial of her request for

22   reconsideration, plaintiff requested an administrative hearing, which was held on February 23,

23   2005, before Administrative Law Judge ("ALJ") Mark C. Ramsey.

24   / / /

25   / / /

26   / / /

1    In his June 18, 2005, decision, the ALJ made the following findings:

2    1.    The child was born on November 22, 1988, and is in the 11th grade;

3    2.    The child has not engaged in substantial gainful activity since the alleged
           onset date;

4

5    3.    The child has a severe impairment;

6    4.    The child's conduct disorder, depressive disorder NOS, and oppositional
           defiant disorder do not meet or medically equal the severity of any
7          impairment listed in Part B, or Part A, of Appendix 1 to Subpart P of Part
           404 of Chapter 20 of the Code of Federal Regulations;

8    5.    The child does not have an extreme limitation in any domain of
           functioning, a marked limitation in two domains of functioning, and does
9          not functionally equal the severity of the listing;

10   6.    The child's subjective complaints are considered credible only to the
           extent they are supported by the evidence of record as summarized in the
11         text of this decision; and

12   7.    The child has not been under a disability at any time from the alleged
           onset date through the date of this decision.

13

14   Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not

15   entitled to benefits. After the Appeals Council declined review on February 25, 2006, this

16   appeal followed.

17

18                           **II. STANDARD OF REVIEW**

19          The court reviews the Commissioner's final decision to determine whether it is:

20   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

21   whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is

22   more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520,

23   521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to

24   support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole,

25   including both the evidence that supports and detracts from the Commissioner's conclusion,

26   must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986);

                                          6

1   Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the

2   Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See

3   Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the

4   administrative findings, or if there is conflicting evidence supporting a particular finding, the

5   finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

6   Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

7   one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

8   v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

9   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

10  (9th Cir. 1988).

11

12                              **III.  DISCUSSION**

13          Because this is a child's application for benefits, it bears noting that the sequential

14  evaluation process is different than for an adult application claiming an inability to work.  The

15  regulations outline a three-step (as opposed to the traditional five-step process for adults)

16  evaluation process to determine whether a child's impairments result in specific functional

17  limitations, which is required for a determination that the child is disabled.  See 42 U.S.C.

18  § 1382c(a)(3)(C)(i).  At step one, if the child is engaged in substantial gainful activity, the child

19  is not disabled.  See 20 C.F.R. § 416.924(b).  At step two, if the child's impairments are not

20  severe, the child is not disabled.  See 20 C.F.R. § 416.924(c).  Finally, at step three, if the child's

21  impairments are severe, but do not meet or functionally equal a listed impairment, the child is

22  not disabled.  See 20 C.F.R. § 416.926a(a).[4]  Thus, to be entitled to benefits, the child must not

23  be working and must have a severe impairment functionally equal to a listed impairment.

24  _____

25          [4]      At step three, if the child's impairment actually equals a listed impairment, the
    child is disabled – much as with an adult application.  Because plaintiff does not argue that any
26  of her impairments actually equal a listed impairment, this decision focuses on functional
    equivalency.

1        In order to determine whether a child's severe impairment functionally equals a

2  listed impairment, the ALJ must consider the child's abilities in six domains:  (1) acquiring and

3  using information; (2) attending and completing tasks; (3) interacting and relating with others;

4  (4) moving about and manipulating objects; (5) self-care; and (6) overall health and physical

5  well-being.  <u>See</u> 20 C.F.R. § 416.926a(b)(1).  If an impairment results in "marked" limitations in

6  at least two domains, the child is disabled.  Or, if an impairment results in an "extreme"

7  limitation in at least one domain, the child is disabled.

8        In her motion for summary judgment, plaintiff argues that the ALJ erred in four

9  ways.  Specifically, plaintiff argues: (1) the ALJ failed to explain how expert evaluation was

10  utilized; (2) the ALJ erred in determining that her severe impairments did not functionally equal

11  an impairment listed in the regulations; (3) the ALJ did not properly consider plaintiff's

12  testimony and lay testimony concerning her subjective complaints; and (4) the ALJ's

13  determination that plaintiff's impairments did not result in marked functional limitations in more

14  than one domain is not supported by substantial evidence.

15      **A.**    <u>**Expert Evaluation**</u>

16        Citing <u>Howard o/b/o Wolff v. Barnhart</u>, 341 F.3d 1006 (9th Cir. 2003), plaintiff

17  argues that the ALJ erred because the decision does not "utilize '. . . a pediatrician or other

18  appropriate specialist' to evaluate the case 'based on the record in its entirety.'"  Specifically, as

19  to the categories of functional limitations relevant to plaintiff's claim, plaintiff contends that

20  "[i]n all these domains, clearly the decision constructed its own case evaluation from the

21  evidence in the record, as opposed to relying on, or even giving any specific weight to, the

22  [medical] evaluations."

23  / / /

24  / / /

25  / / /

26  / / /

Plaintiff is not correct.  As to plaintiff's ability in the domain of acquiring and using information, the ALJ concluded that plaintiff has less than a marked limitation, but that a greater limitation is not supported by the record.  In reaching this conclusion, the ALJ stated:

> Kaiser records do not contain evidence to establish a greater limitation; the psychiatric CE by Dr. Daniel did not contain clinical findings to warrant a greater limitation as his assessment of limitations was based on [plaintiff's] being oppositional rather than having an inability [to] acquire and use information . . . .

As to plaintiff's ability to attend and complete tasks, the ALJ concluded that plaintiff has less than a marked limitation and stated:

> However, a marked or extreme limitation is not appropriate because SA determinations which found she had no limitation in [November] 2003 and less than a marked limitation in March 200[4]; Dr. Daniel's psychiatric CE does not warrant a greater limitation as he rated her GAF at 60 and indicated her limitations could be, not would be, expected to be oppositional to the performance of simple instructions; . . . Kaiser records do not contain evidence to warrant a marked or extreme limitation. . .

Concerning plaintiff's ability to interact and relate to others, the ALJ concluded that plaintiff has a marked, but not extreme, limitation.  The ALJ stated:

> A[n] extreme limitation is not warranted in this domain as the SA determinations found only a marked limitation; Dr. Daniel's psychiatric CE indicated that she could be, not would be, expected to be oppositional responding appropriately to co-workers, supervisors, and the public, responding appropriately to a usual work situation, and dealing with changes in a routine work setting, and he did not give an opinion that she was disabled; Dr. Diamond in his March 23, 2005, noted that while she appeared quite emotionally labile, impulsive, moody, irritable, anxious, and explosive, and as resistant and oppositional, she was sill [sic] workable and noted that medication helped somewhat. . . .
>
> Kaiser records also fail to establish an extreme limitation as they contain evidence of sporadic treatment for [plaintiff's] mental conditions and multiple missed appointments/no shows.  They further document that when treated she did have some improvement:  March 6, 2003, no suicidal or homicidal ideation was reported, October 15, 2004, she was notably more friendly, upbeat, had a three day suspension at school due to lack of cooperation, mother reported she was very up and down with mood, very negative, and very self-deprecating, and diagnosis was depression NOS, October 20, 2004, Dr. Buddenhagen was very impressed by her improvement since she began at Mather Academy but mother reported the same mood problems as the prior week, and the doctor noted he could clearly observe clinically her sadness beneath a pretty fragile/tough

9

demeanor, November 15, 2004, she denied suicidal ideation, and reported
appetite and sleep were okay, November 19, 2004, Dr. Buddenhagen
noted she was quiet but looking less stressed and seemed less angry but
also a bit more child like, and December 29, 2004, a mental health phone
message form indicated the claimant reported the claimant was tolerating
Seroquel well with no side effects.

With respect to the domain of moving about and manipulating objects, the ALJ found no

limitations.  According to the ALJ, "[t]his finding is supported by the SA determinations that

also found no limitations in this area; Kaiser records fail to document any physical impairment

that would establish a limitation in this area. . . ."   As to plaintiff's self-care abilities, the ALJ

found less than marked limitation but concluded that a greater limitation was not warranted

because, among other reasons, "Kaiser records do not contain evidence to establish a greater

limitation; . . . the psychiatric CE does not contain evidence to establish a marked or extreme

limitation, and her GAF was rated at 60; there is no evidence of treatment from the alleged onset

date in 1995 through December 2002. . . ."

        From the foregoing, it is obvious that, contrary to plaintiff's assertion, the ALJ

did in fact consider the opinions of medical specialists and evaluated plaintiff's functional

domains in light of the evidence as a whole.  The court rejects plaintiff's argument that ". . . the

decision provides no basis for thinking that reasonable efforts were made to ensure that a

qualified pediatrician or other individual who specializes in the field of medicine appropriate to

the disability of the individual . . . evaluated the case . . . ."  Specifically, the record reflects a

consultative evaluation by Dr. Daniel, as well as treatment by Dr. Buddenhagen, and agency

evaluations by Drs. Tyl and Meenakshi.

## B.    Application of the Listing of Impairments

        The Social Security Regulations "Listing of Impairments" is comprised of

impairments to fifteen categories of body systems that are severe enough to preclude a person

from functioning.  Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990); 20 C.F.R.

§ 404.1520(d).  Conditions described in the listings are considered so severe that they are

1  irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all

2  the requirements of that listing must be met.  <u>Key v. Heckler</u>, 754 F.2d 1545, 1550 (9th Cir.

3  1985).  In a child's disability case, whether an impairment or combination of impairments is

4  functionally equivalent to a particular listing depends on the child's functioning in six areas, or

5  domains.  <u>See</u> 20 C.F.R. § 416.926a(b)(1).  To functionally equal a listed impairment, the child's

6  impairment must be "marked" in at least two domains, or "extreme" in at least one domain.

7          It appears plaintiff argues that the ALJ's functional equivalency analysis is not

8  supported by explanation.  Plaintiff states:

9          . . . [T]he decision found "marked" impairment, in the domain of
           interacting and relating with others. . . .  The decision contains no
10         explanation, or evidence of consideration, of why Jasmine's mental
           impairments did not result in the necessary second "marked" impairment
11         in one of the other [domains].[5]

12  Again, plaintiff is not correct.  Even a cursory review of the hearing decision reveals that the

13  ALJ did in fact explain his findings.  As to the domains where the ALJ found less than marked

14  limitations, the ALJ explained that evidence did not support a greater limitation.  The ALJ then,

15  as to each such domain, outlined the evidence which demonstrated, at best, less than marked

16  limitations.

17      **C.    <u>Consideration of Testimony</u>**

18          Plaintiff contends that the ALJ disregarded both her testimony and the testimony

19  of her mother and concludes that the ". . . remedy when this occurs is to credit those allegations

20  as a matter of law."

21  / / /

22  / / /

23  / / /

24

25      [5]      Nowhere in her motion for summary judgment does plaintiff argue that her
        impairments are "extreme" as to any category.  She thus appears to concede this point.  Plaintiff
26  makes no argument that her severe impairments actually equal any listed impairment.

1              1.     <u>Plaintiff's Mother's Testimony</u>

2        Plaintiff's argument, in its entirety, is as follows:

3               In addition, although the decision summarizes Jasmine's mother's
testimony . . ., it never refers to it again.  Ignoring lay testimony clearly
4      constitutes error.  (citations omitted).  [¶] This decision turned on
consideration of the functional equivalency domains.  While the listings
5      themselves turn on medical criteria alone, functional equivalency clearly
does not.  Claimant and lay input could not be ignored (except as it
6      chanced to coincide with other evidence).

7        In determining whether a claimant is disabled, an ALJ generally must consider lay

8 witness testimony concerning a claimant's ability to work.[6]  See <u>Dodrill v. Shalala</u>, 12 F.3d 915,

9 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

10 testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

11 evidence . . . and therefore cannot be disregarded without comment."  See <u>Nguyen v. Chater</u>, 100

12 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

13 of lay witnesses, he must give reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at

14 919.

15        The ALJ, however, need not discuss all evidence presented.  See <u>Vincent on</u>

16 <u>Behalf of Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

17 why "significant probative evidence has been rejected."  <u>Id.</u> (citing <u>Cotter v. Harris</u>, 642 F.2d

18 700, 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored

19 evidence which was neither significant nor probative.  See <u>id.</u> at 1395.  As to a letter from a

20 treating psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

21 uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

22 controverted by other medical evidence considered in the decision.  See <u>id.</u>  As to lay witness

23 testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

24 concluded that the evidence was properly ignored because it "conflicted with the available

25

26         [6]     Logically, this rule also applies to testimony concerning functional limitations in
the context of a child's application for benefits.

1   medical evidence" assessing the plaintiff's mental capacity.  Id.

2              In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

3   disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay

4   witness had testified about the plaintiff's "inability to deal with the demands of work" due to

5   alleged back pain and mental impairments.  Id.   The witnesses, who were former co-workers

6   testified about the plaintiff's frustration with simple tasks and uncommon need for supervision.

7   See id.  Noting that the lay witness testimony in question was "consistent with medical

8   evidence," the court in Stout concluded that the "ALJ was required to consider and comment

9   upon the uncontradicted lay testimony, as it concerned how Stout's impairments impact his

10  ability to work."  Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the

11  lay testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

12  Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

13  1054-55.  The court concluded:

14          Because the ALJ failed to provide any reasons for rejecting competent lay
            testimony, and because we conclude that error was not harmless,
15          substantial evidence does not support the Commissioner's decision . . .

16  Id. at 1056-67.

17              From this case law, the court concludes that the rule for lay witness testimony

18  depends on whether the testimony in question is controverted or consistent with the medical

19  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d

20  at 1395.  If, however, lay witness testimony is consistent with the medical evidence, then the

21  ALJ must consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the

22  Commissioner's regulations require the ALJ consider lay witness testimony in certain types of

23  cases.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling

24  requires the ALJ to consider third-party lay witness evidence where the plaintiff alleges pain or

25  other symptoms that are not shown by the medical evidence.  See id.  Thus, in cases where the

26  plaintiff alleges impairments, such as chronic fatigue or pain (which by their very nature do not

1   always produce clinical medical evidence), it is impossible for the court to conclude that lay

2   witness evidence concerning the plaintiff's abilities is necessarily controverted such that it may

3   be properly ignored.  Therefore, in these types of cases, the ALJ is required by the regulations

4   and case law to consider lay witness evidence.

5           The ALJ summarized plaintiff's mother's testimony as follows:

6           [Plaintiff's] mother testified that the claimant's problems started at age 13;
            she is abusive to others and has a temper; that she sees a psychologist and
7           psychiatrist; she has been seeing Dr. Diamond for three months; she takes
            prescription medications, one of which is to calm her down; she has
8           problems at school and gets suspended all the time; she has out of control
            behavior; her grades range from an A to an F; she plays softball and does
9           cheerleading at football games; and she is presently in the 11th grade.

10  The gravamen of plaintiff's argument concerning her mother's testimony is that the ALJ silently

11  disregarded the testimony because he did not mention it further beyond this summary.

12          A review of the ALJ's decision reveals that plaintiff is incorrect in this assertion.

13  As to plaintiff's mother's testimony, the ALJ considered it with respect to plaintiff's ability to

14  acquire and use information, attend to and complete tasks, move about and manipulate objects,

15  interact and relate with others, and care for herself.   Specifically, as to each of these functional

16  areas, the ALJ concluded that plaintiff's mother's testimony did not support a finding of an

17  extreme and/or marked limitation.  Thus, the ALJ clearly considered plaintiff's mother's

18  testimony beyond his summary.  Moreover, it does not appear – and plaintiff does not argue –

19  that the ALJ discounted plaintiff's mother's testimony in any way.  Rather, he simply found that

20  the testimony did not support a particular finding.

21          2.      Plaintiff's Testimony

22          As to plaintiff's testimony, the ALJ provided the following summary:

23          The claimant testified that she was not getting along with her teachers at
            school; at Cordova High School she had a problem fighting with others,
24          which was also the case at Mather Academy; she was presently attending
            Hiram Johnson High School and was having problems with her teacher
25          but got good grades in difficult subjects; she testified that she plans to go
            to college and does her homework; she alleged having a bad attitude and
26          does not want to change; that seeing Dr. Buddenhagen has not helped her;

1

2

3

> she does not have an explanation for her behavior problems but testified she can control herself to a certain extent; she testified that she was depressed and lives a boring life; that her grades vary due to stressing; and that medications help to a certain point.

4  With respect to this testimony, plaintiff appears to argue again that the ALJ failed to consider it

5  beyond this summary.  Again, the court does not agree.  A review of the ALJ's decision reveals

6  that, as with plaintiff's mother's testimony, the ALJ concluded that plaintiff's testimony did not

7  support a finding that plaintiff had either a marked or severe limitation in any of the relevant

8  functional areas.

9  　　　　　In a footnote in plaintiff's brief, plaintiff also seems to attack the ALJ's

10  assessment that plaintiff's ". . . subjective complaints are considered credible only to the extent

11  they are supported by the evidence of record . . ."  Plaintiff states that "[s]uch a formulation

12  counts as error in itself."  However, as with her mother's testimony, the basis for this conclusion

13  is plaintiff's assertion that the ALJ did not consider the testimony.  For the reasons discussed

14  above, the court finds that the ALJ did in fact consider plaintiff's testimony.  Specifically, he

15  considered it and found it to be credible to the extent supported by the record.   Or, interpreting

16  the ALJ's conclusion another way, he found plaintiff's testimony <u>not credible</u> to the extent it was

17  <u>not supported</u> by the record, which is a valid reason.  <u>See</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284

18  (9th Cir. 1996).

19  　　**D.**　　**Plaintiff's Functional Limitations**

20  　　　　　In the only argument plaintiff raises concerning the substance of the medical

21  record – as opposed to the way the ALJ considered the record – plaintiff argues:

22

23

24

25

> As mentioned, the decision found "marked" impairment in the domain of interacting and relating to others, meaning Jasmine needed only one other "marked" finding for disability.  The decision's handling of the three domains most likely to support such a finding lacked grounding in substantial evidence, and substantial evidence *did* support a "marked" finding, in at least one of them.  Again, the issue is *whether* marked impairment exists, not *why*.  (italics in original).

26  ///

1   Plaintiff focuses her analysis on the following domains:  (1) acquiring and using information;

2   (2) attending and completing tasks; and (3) self-care.  Because a marked limitation results from

3   an impairment that seriously interferes with the child's ability to independently initiate, sustain,

4   or complete domain-related activities, see 20 C.F.R. § 416.926a(e)(2), the question is whether

5   plaintiff's impairments meet this standard for these three domains.[7]

6           1.      Acquiring and Using Information

7                   To prevail, plaintiff must point to evidence to establish that her impairments

8   seriously interfere with her cognitive abilities.  A review of plaintiff's grades indicates that she

9   cannot make this showing.  Specifically, plaintiff's grades for the ninth grade were:

10                          January 2003

11                          Art                          F
                            Computer Applications        A
12                          English                      C-
                            Algebra                      D
13                          P.E.                         B
                            Science                      C+
14
15                          June 2003

16                          Keyboarding                  B-
                            P.E.                         D
17                          Art                          C
                            Science                      C-
                            English                      F
18                          Algebra                      D

19  For the tenth grade, plaintiff's grades were:

20                          November 2003

21                          English                      B
                            Algebra                      B
22                          Team Sports                  B
                            U.S. History                 C
23
24  _____

25          [7]     Plaintiff makes the conclusory statement that the evidence does support a finding
    of marked limitation in at least one other domain, but does not specify which one or what
26  evidence supports her conclusion.

<u>January 2004</u>

| | |
|---|---|
| Reading | A |
| English | C |
| Algebra | B |
| Life Science | C |
| U.S. History | A |
| Life Skills | B |

<u>April 2004</u>

| | |
|---|---|
| English | B |
| Algebra | C |
| Team Sports | A |
| Life Science | B |
| U.S. History | A |

<u>June 2004</u>

| | |
|---|---|
| English | A |
| Algebra | C |
| Life Science | A |

<u>August 2004</u>

| | |
|---|---|
| English | A |
| Algebra | B |
| Life Science | A |

Plaintiff's grades in the eleventh grade were:

<u>November 2004</u>

| | |
|---|---|
| Reading | C |
| English | F |
| Algebra | B |
| Team Sports | F |
| U.S. History | C |
| World Culture | C |

<u>January 2005</u>

| | |
|---|---|
| English | F |
| World History | B |
| Desktop Publishing | C |
| Office Assistant | D |

/ / /

/ / /

As defendant observes, plaintiff's hearing testimony sheds some light on these grades.  In particular, the following exchange took place at the hearing:

> Q:    Okay.  I noticed your grades are good in the difficult subjects and poor in subjects that are easy, like sports and art.  The easy subjects you're getting bad grades in and the – you're getting real good grades in the difficult subjects.  What's that all about?
>
> A:    In PE, which is team sports or whatever, at Mather, they're – it's not regular PE.  Team – they call it team sports.  When you have to like – I don't know.  They – it's an Army school, so they've got Army procedures.  They all up in your face about doing pushups.  And I'm not with that.  I don't do pushups.
>
> Q:    You're not interested in that?
>
> A:    No.

From this, it appears that, at least to some extent, plaintiff's low grades can be explained by lack of interest rather than any cognitive inability resulting from her impairments.  Moreover, of the 43 grades reported above, only nine are below average.  And, in history, math, and science, plaintiff generally did well.

This record simply does not demonstrate serious interference with plaintiff's ability to acquire and use information.   To the contrary, the records shows that plaintiff can apply herself and that, when she chooses to do so, she does well.  Therefore, the court concludes that the ALJ's determination that plaintiff did not have a marked limitation in acquiring and using information is supported by substantial evidence.

2.    Attending and Completing Tasks

As plaintiff notes, the examples contained in the regulations for this domain are "more behavioral" than for acquiring and using information, which looks to cognitive ability.  Compare 20 C.F.R. § 416.926a(g)(3) with 416.926a(h)(3).  As defendant notes, observations by the child's teachers are the most relevant in assessing limitations in this domain.  See 20 C.F.R. § 416.926a(b)(3).  The record contains such an assessment from one of  plaintiff's teachers, dated March 4, 2004.  In particular, the teacher stated that plaintiff had no problems with respect

to attending and completing tasks and opined that plaintiff's functioning was age-appropriate.

The teacher added the following:

> Jasmine is generally very cooperative and on-task while she is in my charge.  I have her for reading and history, and in neither of these classes does she act in a manner that might suggest an inability to concentrate.  Her work is also of a quality that indicates to me an ability to transfer verbal and written instructions to paper.  She does have periodic outbursts of anger, generally directed at other students, but aside from that, her behavior is very good.

Again, the court concludes that the ALJ's finding in this domain is supported by substantial evidence.

3.    Self-Care

Plaintiff alleges that the evidence cited by the ALJ is inadequate for the conclusion that plaintiff does not have a marked limitation in this domain, but she does not point to any evidence to suggest a greater limitation.  A review of the record reflects that no doctor, or anyone else for that matter, has opined that plaintiff cannot care for herself.  In fact, Dr. Daniel opined that plaintiff's overall level of functioning is 60 out of 100, which does not suggest a marked limitation.  The court finds that the ALJ was correct in concluding that the evidence does not support a conclusion that plaintiff's limitation in this domain is marked.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

### IV.  CONCLUSION

2          Based on the foregoing, the court concludes that the Commissioner's final

3  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS

4  HEREBY ORDERED that:

5                  1.        Plaintiff's motion for summary judgment is denied;

6                  2.        Defendant's cross-motion for summary judgment is granted; and

7                  3.        The Clerk of the Court is directed to enter judgment and close this file.

8

9  DATED:   June 20, 2007.

10

11                                                                _____

CRAIG M. KELLISON

12                                                                UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26